## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:09cv435

| | | |
|---|---|---|
| BANK OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| THOMPSON M. LYKES, individually; | ) | |
| and THOMPSON M. LYKES as Trustee | ) | |
| of the Thompson M. Lykes Revocable | ) | |
| Trust under Trust Agreement dated | ) | |
| March 21, 2002, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court upon plaintiff's Motion to Dismiss

Counterclaims.(#6) The defendants responded with their Memorandum in Opposition

on April 21, 2010(#8) and the plaintiff filed a Reply on May 3, 2010.(#9)   Having

carefully considered plaintiff's Motion to Dismiss Counterclaims and reviewed the

pleadings, the court enters the following findings, conclusions, and Recommendation

that such motion be allowed.

## FINDINGS AND CONCLUSIONS

### I.    Background

In this action, plaintiff seeks to enforce personal guarantees allegedly given by

defendants in which they unconditionally guaranteed payment to plaintiff of a $4.6 million loan. Complaint, at ¶ 9. In 2007, non-party Toxaway River Preserve, LLC, allegedly secured the loan from plaintiff to purchase land in western North Carolina for development. Id., at ¶¶ 7-8. Plaintiff has alleged that Toxaway River Preserve, LLC, has failed to repay the loan, id., at Ex. D, E, & F, and that defendants herein have failed as guarantors to fulfill their obligation to repay the loan in accordance with the terms of the guarantees. Id.

On March 10, 2010, defendant Answered the Complaint and asserted against plaintiff its Counterclaims.(#5) Such counterclaims are based on a theory that they are not obligated to make repayment because plaintiff was encouraged to hold the stock of non-party Bank of America Corporation while its value declined. In relevant part, defendants have alleged as follows:

9. Plaintiff participated in a fraudulent scheme to deceit [*sic*] the Defendants concerning their ownership of BAC common stock. The scheme: (i) deceived the Defendants regarding Plaintiff's and BAC's business, finances, performance, and the intrinsic value of BAC common stock and (ii) caused Defendants to refrain from selling their BAC common stock when they otherwise would have sold it only to have the value of BAC stock plunge.

10. Plaintiff made certain representations that were intended to reach and did reach the Defendants to assure them in the financial condition of Plaintiff and BAC and to urge them to retain their stock ownership in BAC, upon which Plaintiff relied. Plaintiff misrepresented as follows:

a. Plaintiff and BAC had a strong position of liquidity which would fund its balance sheet;

b. Plaintiff and BAC had prudent loan origination and underwriting standards;

c. Plaintiff and BAC had a well-collateralized loan portfolio;

d. Plaintiff and BAC were well-capitalized;

e. Plaintiff and BAC were actively managing the risks associated with its business and loan portfolio;

f. Plaintiff and BAC had established reserves which would cover anticipated loan losses in future quarters preserving Plaintiff and BAC's liquidity and ability to function as an ongoing concern;

g. BAC was going to be able to continue providing a dividend to shareholders;

h. Plaintiff and BAC were experiencing growth and would deliver strong performance for the benefit of its shareholders;

i. Defendants' investments in BAC were safe and secure.

11. At all relevant times, Plaintiff was aware of Defendants' financial portfolio and investments with BAC and that Plaintiff Defendants' [*sic*] private banker.

12. Plaintiff misrepresented Defendants [*sic*] in failing to reveal certain financial information about BAC, more specifically information concerning the financial condition of BAC and its mounting losses during the financial crises not to mention the hug [*sic*] losses at Merrill Lynch, which the Bank of America acquired on January 1, 2009.

13. Plaintiff participated in bad faith lending and in a position of conflict in which they acted as the lender/note holder and as the financial advisor for the borrower. At all relevant times, Plaintiff had complete knowledge of Defendants' investments in BAC, as well as Defendants' reliance upon the collateral used to finance the loan.

14. Plaintiff had a fiduciary relationship with Defendants which was

neglected. At all relevant times, Defendants had and reposed faith, trust and confidence in the Plaintiff bank and was dependent on the Plaintiff's advice and Plaintiff exercised control and/or influence over the Defendants' affairs.

15.    Plaintiff owes a special duty to Defendant [*sic*] and failed to look out for their best interests.

Counterclaims,(#5) at ¶¶ 9-15.  Noticeably absent from such the factual allegations underpinning the Counterclaims is any allegation that plaintiff herein is the alter-ego of nonparties Bank of America Corporation or Merrill Lynch. Based on such allegations and other predicate factual statements, defendants have asserted the following Counterclaims:

1.    Fraud/Fraudulent Concealment;
2.    Negligent Misrepresentation;
3.    Breach of Fiduciary Duty;
4.    Bad Faith Lending; and
5.    Unfair and Deceptive Trade Practices.

Counterclaims,(#5) ¶¶ 16-50.

Plaintiff has moved under Rule 12(b)(6), Federal Rules of Civil Procedure, to dismiss defendants' Counterclaims in their entirety.(#6)  It argues that all of such claims are improperly premised on alleged wrongdoing by non-parties, and to the extent such counterclaims are based on any alleged wrongdoing of plaintiff, they should also be dismissed because the allegations are mere legal conclusions and implausible inferences that fail to meet the pleading standards of Rule 12(b)(6).

Motion to Dismiss,(#6)at ¶ 4. Further, plaintiff contends that as to all the counterclaims, defendants have failed to allege facts necessary to establish each element of their claims, that they have asserted claims not recognized in North Carolina, and that they have failed to state with the required particularity the circumstances constituting fraud and negligent misrepresentation. Id., at ¶ 5. In response, defendants argue that they have met the Rule 12(b)(6) standard as to each counterclaims and that this court's decision in Goldstein v. Bank of America, N.A., 2010 U.S. Dist. LEXIS 28887 (W.D.N.C. Jan. 19, 2010) is not controlling. Response,(#8) at p. 4. In its Reply, plaintiff argues that the Response fails to either explain how the alleged scheme is plausible or identify facts that would support each element of defendants' Counterclaims. Reply,(#9) at p. 2.

## II.    Applicable Standard

Until recently, a complaint could not be dismissed under Rule 12(b)(6) unless it appeared certain that the complainant could prove no set of facts which would support their claims and entitle them to relief. Neitzke v. Williams, 490 U.S. 319 (1989); Conley v. Gibson, 355 U.S. 41 (1957). This "no set of facts" standard has been specifically abrogated by the Supreme Court in recent decisions.

First, in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Court held that the "no set of facts" standard first espoused in Conley, supra, only describes the

"breadth of opportunity to prove what an adequate complaint claims, not the minimum adequate pleading to govern a complaint's survival." Id., at 563. The Court specifically rejected use of the "no set of facts" standard because such standard would improperly allow a "wholly conclusory statement of claim" to "survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Id., at 561 (alteration in original).

Post Twombley, to survive a Rule 12(b)(6) motion to dismiss, a complainant must allege facts that "raise a right to relief above the speculative level." Id., at 555.

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment]
> to relief" requires more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will not do . . . .

Id. (second alteration in original; citation omitted). Further, a claim will not survive Rule 12(b)(6) review where it contains "naked assertion[s] devoid of further factual enhancement." Id., at 557. Instead, a complainant must now plead sufficient facts to state a claim for relief that is "*plausible* on its face." Id., at 570 (emphasis added).

While the Court was clear in Twombly that Conley was no longer controlling law, see Twombly, 550 U.S. at 563, and Felman Production Inc. v. Bannai, 2007 WL 3244638, at *4 (S.D.W.Va. 2007), it again visited the Rule 12(b)(6) pleading standard in Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937 (May 18, 2009). In Iqbal, the Court

determined that Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Id., S.Ct., at 1949. The Court explained that, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" Id. (citing Twombly, supra; emphasis added). What is plausible is defined by the Court:

> [a] claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Id. This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." Id. Thus, a claim will fall short of the plausibility standard where the complainant pleads "facts that are 'merely consistent with' a defendant's liability . . . ." Id. While the court accepts plausible factual allegations made in support of a claim as true and considers those facts in the light most favorable to claimant in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP, 213 F. 3d 175, 180 (4th Cir. 2000).

The court has accepted as true all of the factual allegations contained in the Counterclaims, and will identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft, supra, at 1950. As reflected below, the court has assumed the veracity of any well-pleaded factual

allegations "and [will] then determine whether they plausibly give rise to an entitlement to relief." Id. (alteration added).

## III. Discussion

### A. Implausibility

From the outset, the undersigned believes that the decision of this court in Goldstein, supra, is both applicable and instructive. While defendants are quite correct as to the differences in the factual settings of the respective cases, the claims therein asserted are nearly identical to those asserted in this case and such does not distinguish the application of Iqbal, supra. In Goldstein, plaintiff asserted causes of action against BANA sounding in fraud and breach of fiduciary duty, contending that BANA had engaged in a scheme with the developer to enhance its fee income by making loans on residential building lots that BANA knew were not worth the purchase price. In essence, the claims in Goldstein were premised on a theory that BANA would engage in a scheme that would artificially inflate the value of collateral securing loans, simply to secure loan origination fees. This court found that such theory was implausible as the risks and subsequent losses resulting from knowingly lending more money than the collateral is worth would more than offset any incremental profit from loans fees. Id., at *12.

In this case, defendants aptly summarize their theory of BANA's motivation in

their Response:

> Defendants owned shares of Bank of America Corporation ("BAC"), which is BANA's parent company. BANA encouraged Defendants to continue to hold these shares despite engaging in risky behavior which it failed to disclose to Defendants and which would ultimately drive down the value of the stock, causing the default. In addition to accelerating the loan, BANA also increased the interest rate by six percentage points. *Essentially, Plaintiff's conduct amounts to hedging its financial position. When BANA is doing well, the loan is paid as agreed. But when BANA is doing poorly, the value of BAC stock (which it encouraged Defendants to retain) drops, forcing a default and permitting BANA to collect the principal sooner that it otherwise would have been able to, and at a higher interest rate.*

Response, at pp. 1-2 (emphasis added). While the undesigned has accepted such as the underlying thesis of defendants' Counterclaims, no supporting citation is provided to portions of the Counterclaims that would support each statement. See L.Cv.R. 7.1(C). Defendants' theory, then, is that:

(1)     BANA required defendants to personally guarantee a $4.6 million dollar loan;

(2)     that BANA "encouraged" but did not require such guarantors to hold in their portfolios stock in the bank's parent corporation; and

(3)     that such encouragement as to holding or owning stock in plaintiff's parent was intended not to insure payoff of the balance of the loan and accrued interest in the event of default by the borrower, but to hedge the stock price of BANA's parent corporation by being able to accelerate the

loan and increase the interest rate if the value of the stock of the parent

corporation decreased.

While the court fully understands the concept that a loan guarantee may be called even

without events of default by the borrower based on decreases in either the  liquidity

or value of the guarantors' portfolio (where such is made part of the agreement of

guarantee), the undersigned notes that there is no allegation in either the Complaint

or Counterclaims that the loan was defaulted and the guarantee called based on the

decreased value of defendants' portfolios.  Rather, the only allegations as to the events

that triggered default appear in the Complaint, wherein plaintiff alleges that default

occurred when Toxaway River Preserve, LLC failed to make loan payments.  <u>See</u>

Compl., at ¶ 13.  Plaintiff alleges that as a "result of <u>Borrower's</u> defaults, BANA

accelerated the full balance . . . ."  <u>Id.</u>, at ¶ 14.

In addition to finding no support in either the factual allegations of the

Complaint or the Counterclaims, defendants theory in this case suffers precisely from

the same infirmity manifested in <u>Goldstein</u>, to wit, implausibility.  For defendants'

theory to be sound, it would have to be within the realm of plausibility that BANA

intentionally secured a loan by linking it to portfolios of guarantors that would have

substantially diminished value in the event of default.  It would also not be within the

realm of plausibility to believe that BANA intentionally structured loans to fail at

precisely the same time that the value of the stock of its parent company failed as a way of generating profits. Put in even simpler terms, to survive Rule 12(b)(6) analysis it would have to be plausible that a bank would engage in a scheme that, if successful, risked loss of $4.6 million dollars of BANA funds in order to increase short-term revenue derived from a default interest rate a few percentage points higher than the contract interest rate, all to hedge the stock price of a parent corporation. Not only would such a scheme impair the ability of the guarantors to repay the principal, it would impair their ability to pay the increased interest. Defendants' proffered theory is not only implausible, it would require BANA to act in a manner that would patently be against its own financial self interest, flying in the face of well established fundamental economic principles. See Adam Smith, The Wealth of Nations (1776).

The decision of the district court in Feeley v. Total Realty Management, 2009 WL 2902505 (E.D.Va. Aug. 28, 2009),[1] is also instructive. The district court reasoned in dismissing plaintiffs' claims with prejudice that

> Plaintiffs claim as a threshold matter that the Banks colluded with TRM, corrupt real estate appraisers and bank loan officers to arrange for unsuspecting investors to enter into loans the investors could never pay, in land they could never sell, that was overvalued; and now that TRM has declared bankruptcy, that the Banks must charge off the investor loans and repay the investors. What does the bank get out of this, loan

---

[1]     Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

> fees, foreclosed upon unimproved land to carry on their books? To the extent that Plaintiffs have essentially alleged that the banks and Maryville were in cahoots with TRM, as the basis for Liability these allegations are simply implausible. . . .This is especially true, in light of the Complaint's utter failure to allege how the banks entering into a scheme to make under-collateralized loans would be in their self-interest.

Id., 2009 WL at 5. Not only is there no conceivable self-interest of BANA, defendants unsupported theory that this was somehow cooked up to benefit the parent corporation is equally unfathomable as a scheme to cause loans to fail at the same time the parent company is appearing to falter would be akin to throwing a rock to a drowning man. As another court found,

> we can think of no logical reason why [a] Bank would make it a practice to intentionally make loans for an amount in excess of the collateral's value and risk substantial losses in the event of default.

Robertson v. First Union Nat'l Bank, 565 S.E.2d 309, 315 (S.C. Ct. App. 2002).

More fundamental in this matter is the lack of factual allegations that would support the asserted theory, much less the elements of each Counterclaim. Indeed, defendants have not alleged that BANA was the alter ego of either its parent or of its sister Merrill Lynch.

Inasmuch as the same factual allegations underpin all of defendants Counterclaims, and it appearing that defendants have failed to allege facts upon which such claims could plausibly proceed, the undersigned is compelled, respectfully, to recommend to the district court that defendants' Counterclaims for Fraud/Fraudulent

Concealment, Negligent Misrepresentation, Breach of Fiduciary Duty, Bad Faith Lending, and Unfair and Deceptive Trade Practices be dismissed with prejudice in accordance with Rule 12(b)(6).

## B. Individualized Analysis

In addition to reviewing the claims from the perspective of defendants' theory of a scheme to hedge the stock of a parent corporation, in an abundance of caution and to assist the district court, the court will also conduct a *seriatim* review of each claim under Rule 12(b)(6).

### 1. Fraud/Fraudulent Concealment

In their first Counterclaim, defendants contend that plaintiff has engaged in fraud and fraudulent concealment. Fraud may occur through misrepresentation or through omission under North Carolina common law.

The essential elements of a claim of fraud by misrepresentation are: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. Jolly v. Acad. Collection Serv., 400 F. Supp. 2d 851 (M.D.N.C. 2005).

In order to plead fraud by omission, a plaintiff must allege the following:

(1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time

period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

Breeden v. Richmond Community College, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (citations omitted).  See also Food Lion, LLC v. Schuster Mktg. Corp., 382 F. Supp. 2d 793, 797 (E.D.N.C. 2005).

Turning first to Rule 9(b), such rule requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Fed.R.Civ.P. 9(b).  A complaint which contains"[m]ere generalities and conclusory allegations of fraud will not suffice" to support a claim for fraud.  Norman v. Tradewinds Airlines, Inc., 286 F. Supp. 2d 575, 594 (M.D.N.C. 2003) (citation omitted).  At a minimum, a complainant must allege the "time, place, and content of the false representations, as well as the identity of the person making the representations and what he obtained thereby."  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999).

Applying the reasoning of Harrison to the allegations of the Counterclaim, defendants have not made any allegation concerning a representation of fact, rather, each statement they cite is simply a "forward-looking opinion."    Specifically,

defendants alleged that plaintiff misrepresented the following:

- a. Plaintiff and BAC had a strong position of liquidity which would fund its balance sheet;
- b. Plaintiff and BAC had prudent loan origination and underwriting standards;
- c. Plaintiff and BAC had a well-collateralized loan portfolio;
- d. Plaintiff and BAC were well-capitalized;
- e. Plaintiff and BAC were actively managing the risks associated with its business and loan portfolio;
- f. Plaintiff and BAC had established reserves which would cover anticipated loan losses in future quarters preserving Plaintiff and BAC's liquidity and ability to function as an ongoing concern;
- g. BAC was going to be able to continue providing a dividend to shareholders;
- h. Plaintiff and BAC were experiencing growth and would deliver strong performance for the benefit of its shareholders; [and]
- i. Defendants' investments in BAC were safe and secure.

Counterclaims, at ¶ 10. Defendants go on to further allege that plaintiff

misrepresented Defendants [*sic*] in failing to reveal certain financial information about BAC, more specifically information concerning the financial condition of BAC and its mounting losses during the financial crises not to mention the hug [*sic*] losses at Merrill Lynch, which the Bank of America acquired on January 1, 2009.

Id., at ¶ 12. Not only do most of such allegations involve typical forward-looking

statements of publicly traded corporations, they do not meet the requirements of North

Carolina law concerning allegations of fraud against a corporate actor, which requires

the complainant to identity the individual who made the alleged misrepresentation, the

circumstances in which the alleged misrepresentation was made, and whether the

individual who allegedly made the misrepresentations had sufficient authority to bind

the corporate entity. <u>Coley v. N.C. Nat'l. Bank</u>, 41 N.C. App. 121, 125-26 (1979).

These allegations simply do not move the ball forward as to either fraud or fraudulent concealment. Ultimately, defendants fail to allege or identify any benefit BANA derived from the allegedly false representations made or any facts that were purportedly concealed. This logical leap cannot be made because, as discussed above, the theory is simply implausible. Thus, defendants' allegations of fraud and fraudulent concealment are conclusory and fail to meet the specificity requirements under Rule 9(b). The undersigned will recommend that this claim be dismissed under Rule 9(b) as fraud by either misrepresentation or omission has not been pled with the required specificity.

Turning next to Rule 12(b)(6), defendants' allegations of fraud and fraudulent concealment also do not satisfy the pleading requirements of <u>Iqbal</u>. As discussed above, while defendants have argued that BANA engaged in such conduct to hedge the parent's stock value, they have not in way pled *scienter*. Defendants have failed to plead facts as to how BANA knew of the true financial condition of its parent corporation. Indeed, defendants have failed to allege how BANA would have had knowledge in 2007 of the looming downturn in the real estate market or stockmarket in 2008, or any logical reason why BANA, armed with such knowledge, would continue to make loans (such as the loan in this case) knowing that the development

**16**

would fail. As discussed in greater detail above, the lynchpin to this allegedly fraudulent scheme was the supposed willingness of BANA to throw itself on its own sword by making loans that it knew would go bad, all for the benefit of a parent corporation; however, not only is such theory implausible, absolutely no plausible facts have been alleged in support of this theory. This claim also fails under Rule 12(b)(6) analysis.

### 2. Negligent Misrepresentation

In alleging and supporting a claim for negligent misrepresentation, the essential elements are that defendants justifiably relied to their detriment on information prepared without reasonable care by a person who owed the relying party a duty of care. Hudson-Cole Dev. Corp. v. Beemer, 132 N.C.App. 341, 346 (1999). Defendants have failed to allege the essential elements of detrimental reliance.

First, defendants have failed to allege that any employee of plaintiff provided them with any negligently generated information and the time, place, content or other circumstances of such communication. Further, as discussed above, the alleged misrepresentations were not as to facts, but were for the most part forward looking statements. Perhaps most telling is an absolute absence of any allegation concerning any cognizable duty of care between a lender and guarantor. This claim must also be dismissed under Rule 12(b)(6) as no plausible allegations that would support a claim

on each and every element of negligent misrepresentation have been asserted.

### 3. Breach of Fiduciary Duty

From the outset, a fiduciary relationship must exist between the parties before a claim can arise for breach of that fiduciary duty. White v. Consol. Planning, Inc., 166 N.C.App. 283, 293 (2004), disc. review denied, 359 N.C. 286 (2005). It is well settled that a fiduciary relationship arises only when the complainants place special confidence in another person, to the extent that the party in whom such special confidence is placed is bound to act in the best interests of the party placing the confidence. Dalton v. Camp, 353 N.C. 647, 651 (2001). An essential element of the fiduciary relationship is that the purported fiduciary exercised influence over the complainants by virtue of the trust placed in such alleged fiduciary. Id., at 652.

While they allege that a fiduciary relationship existed, Counterclaims, at ¶¶ 37-38, they fail to allege how such relationship was created. Thus, the court is left to discern the relationship, which appears to be that of lender-borrower or lender-guarantor, and the undersigned cannot discern any difference between a borrower and a guarantor as the latter typically stands in the former's shoes upon default. There is no fiduciary relationship between a lender and a borrower under North Carolina law. Branch Banking & Trust v. Thompson, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) ("The mere existence of a debtor-creditor relationship between the parties does not

create a fiduciary relationship.") Further, the Court of Appeals for the Fourth Circuit recognized in <u>South Atlantic Ltd. P'ship of Tenn. L.P. v. Riese</u>, 284 F.3d 518, 533 (4th Cir. 2002), that

> North Carolina is reluctant to impose 'extracontractual fiduciary obligations' in the context of general commercial contracts; thus, even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other.

<u>Id.</u> (citation omitted); <u>See also</u> <u>Smith v. GMAC Mortg. Corp.</u>, 2007 WL 2593148, at *6 (W.D.N.C. Sept. 5, 2007).   Defendants have made no plausible allegations that BANA "thoroughly dominated" them in the transaction, and such would be difficult to imagine in the alleged circumstances inasmuch as defendants had under their control some $22 million dollars when they guaranteed the loan.  Indeed, the court can imagine few impediments to these defendants turning to other lenders in 2007 if they so desired.  The undersigned will recommend that this count also be dismissed as defendants have failed to state a cognizable claim under North Carolina law or satisfy the pleading requirements under <u>Iqbal.</u>

### 4.    Bad Faith Lending

There is no recognized claim for "bad faith lending" under North Carolina law and this claims should be summarily dismissed.

### 5.    Unfair and Deceptive Trade Practices

A state-law claim for Unfair and Deceptive Trade Practices is governed by Chapter 75-1.1(a) of the North Carolina General Statutes, which provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Id. When such provision was enacted into law in 1969, it contained the following statement of purpose:

> The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

N.C. Gen. Stat. 75-1.1(b). See also Edmisten v. Penney Co., 292 N.C. 311 (1977) In response to a decision of the North Carolina Supreme Court in Edmisten, Section 75-1.1(b) was amended in 1977 to read "[f]or the purposes of this section "commerce" includes all business activities, however denominated . . . ." Id.

The UDTPA is, without doubt, a scheme regulating conduct between buyers and sellers and between businesses. See Roberson v. Dale, 464 F.Supp. 680 (M.D.N.C. 1979). To state a cause of action under the UDTPA, defendants must allege the following:

(1)     conduct constituting an "unfair or deceptive act or practice;"

(2)     conduct "in or affecting commerce," and

(3)    that such conduct proximately caused actual injury to [defendants].

Food Lion, Inc. v. Capital Cities/ABC Inc., 951 F. Supp. 1224, 1230 (M.D.N.C. 1996).  A mere breach of contract, standing alone, is insufficient to establish an unfair or deceptive trade practice claim. Boyd v. Drum, 129 N.C.App. 586, 594, aff'd, 350 N.C. 90 (1999).

The centerpiece of defendants claim is that BANA somehow had notice of BoA Corp.'s financial condition and misrepresented that condition to defendants.  The basis for such knowledge has not been alleged, and the court can find no authority which would allow an inference to arise simply because BANA is a subsidiary of BoA Corp. As to the statements allegedly made, the statements are not of present fact, but forward looking opinions as to the value of another company's stock.  As such, it is simply implausible that such statements could be considered either unfair or deceptive.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion to Dismiss Counterclaims (#6)  be **ALLOWED,** and that all counterclaims be **DISMISSED** with prejudice under Rule 12(b)(6).

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).

Signed: May 20, 2010

Dennis L. Howell
United States Magistrate Judge